UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SOS FURNITURE COMPANY, INC.,

     Plaintiff,

v.                                     Case No. 6:18-cv-898-Orl-37KRS

MORAD SALEM,

     Defendant.
_____

## ORDER

Before the Court is Defendant Morad Salem's ("**Morad**") Motion to Dismiss or to Abstain. (Doc. 11 ("**Motion**").) Plaintiff SOS Furniture Company, Inc. ("**SOS**") opposes. (Doc. 15.) On review, the Motion is due to be granted in part and denied in part.

### I.    BACKGROUND

Morad is accused of embezzling corporate funds and refusing to repay a loan from SOS. (*See* Doc. 10). SOS is a leading mattress retailer with locations in Florida, Georgia, and Texas (*Id.* ¶ 7), owned by Morad's three brothers, including Maged Salem ("**Maged**"), who founded the company in 2002. (*Id.*)

Morad held no interest in SOS. (Doc. 10, ¶ 12; Doc. 15, pp. 4, 12.) He partnered with another one of his brothers to operate a separate retail mattress company in Miami-Dade County, Florida ("**Miami Company**"). (*Id.* ¶ 8.) In 2011, however, his brother removed Morad as an officer and shareholder of the Miami Company after discovering that he had embezzled company funds. (*Id.*)

-1-

Upon his removal from the Miami Company, Morad moved from Florida to Boston and immediately sought financial assistance from SOS. (*Id.* ¶¶ 8, 9.) Although it had no retail locations or business operations in or near Boston, SOS put Morad on payroll. (*Id.* ¶ 9.) Morad "assisted with menial tasks, such as communicating with SOS's website developer or traveling to SOS's headquarters on occasion, [but he] provided no meaningful value to the business." (*Id.*)

In or about April 2014, Morad engaged in a systematic scheme in which he embezzled corporate funds from SOS for his own personal use. (*Id.* ¶ 10.) Morad executed his scheme by: (1) directing payments from SOS's bank account to pay his personal expenses, including rent and insurance, for $182,831.60; and (2) forging SOS checks he made payable to either himself or his wife for $90,760.56. (*Id.*) Because of the many operating expenses that SOS incurred each month, Morad's fraudulent activity went undetected. (*See id.*)

Although Morad swindled large sums of money from SOS, Morad approached Maged and requested a $1 million loan. (*Id.* ¶ 12.) When Maged refused to give a Morad $1 million, Morad asked for $250,000 loan instead. (*Id.*) Still unaware that Morad was embezzling corporate funds, SOS gave Morad a $250,000 loan (the "**Loan**"). (*Id.*)

In early 2017, after repeated demands by Morad, SOS agreed to consider expanding its business into Boston. (*Id.*) Discussions ensued between the parties, and SOS offered to provide Morad with "seed money [("**Seed Money**")] to establish a new wholly owned subsidiary of SOS in Boston." (*Id.*) SOS also demanded, and Morad orally agreed to, repay the Loan ("**Loan Agreement**"). (*Id.* ¶¶ 13, 30.)

Without the benefit of counsel, SOS and Morad then entered into a "Purchase Agreement." (*Id.* ¶ 12) In the Purchase Agreement, the parties memorialized Morad's obligation to repay the Loan. (*Id.* ¶¶ 13, 35.) SOS also agreed to provide Morad with Seed Money for the expansion in Boston by purchasing his interest in Mattress Pal, another wholly owned subsidiary of SOS. (*Id.* ¶ 12; *see also* Doc. 15, pp. 3–4.) SOS alleges, however, that "[Morad] did not actually own any interest in Mattress Pal or SOS at that time." (Doc. 10, ¶ 12.)

In mid-2017, discord arose about the terms on which SOS would launch its business in Boston, prompting the parties to modify the Purchase Agreement. (*Id.* ¶ 14.) Through an agreement titled "Morad Salem Declaration" (**"Modification Agreement"**), SOS rescinded its offer to provide Morad with Seed Money and instead agreed to: (1) give Morad twelve and one-half percent (12.5%) of Class B, non-voting shares, of SOS; and (2) increase Morad's salary to $260,000 per year. (*Id.* ¶ 15.) "SOS's intent was to deliver the gifted shares once Morad demonstrated an ability and competency to open and operate SOS's business in Boston." (*Id.*)

Dissatisfied with the conditions on which SOS would fund the Boston company, Morad immediately rescinded and terminated the Modification Agreement. (*Id.* ¶ 16.) SOS accepted Morad's rescission and the parties continued to negotiate the terms of SOS's expansion in Boston. (*Id.* ¶ 17.) In January 2018, following unsuccessful negotiations, Morad "withdrew his interest and involvement in SOS" but he continued to receive a salary from SOS and never repaid the Loan. (*Id.* ¶¶ 13, 17.)

Around three months later, SOS discovered that Morad had been embezzling

corporate funds. (*Id.* ¶ 18.) SOS immediately terminated Morad's at-will employment. (*Id.*). After intervention by Morad's father, SOS rehired Morad at a lower salary. (*Id.*)

On or about May 15, 2018, Morad's counsel sent a letter to SOS demanding that it pay Morad the Seed Money identified in the Purchase Agreement. (*Id.* ¶ 19.) SOS refused and instead investigated to determine the scope and extent of Morad's embezzlement. (*Id.* ¶ 19.) Through the investigation SOS learned that Morad had embezzled at least $272,592.16 in corporate funds ("**Embezzled Funds**"). (*Id.*) On June 4, 2018, SOS terminated Morad's employment again and demanded immediate repayment of the Embezzled Funds and the Loan. (*Id.*)

On June 8, 2018, SOS sued Morad. (Doc. 1.) Now, SOS brings six claims against Morad: (1) civil theft (Count I); (2) conversion (Count II); (3) breach of contract (Count III); (4) breach of the implied covenant of good faith and fair dealing (Count IV); and declaratory relief (Counts V and VI). (*Id.* ¶¶ 21–40, 51–59.) A few days later, Morad initiated his own action in state court against SOS and its owners (the "**Owners**"). *See Salem v. SOS Furniture Co. Inc.*, No. 2018-CA-006279-O (Fla. Cir. Ct. 2018) ("**State Court Action**").

Pending is Morad's motion to the Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7). (Doc. 11.) With briefing complete (Doc. 15), the matter is ripe.

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a

claim upon which relief can be granted." A complaint "that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint does not need detailed factual allegations. Yet "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alterations and internal quotation marks omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A court ordinarily cannot consider matters outside the pleadings when evaluating a motion to dismiss under Rule 12(b)(6). *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Even so, "a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). In determining whether a document is central to the plaintiff's case, the court asks "whether the plaintiff would have to offer the document to prove his case." *Lockwood v. Beasley*, 211 Fed. App'x. 873, 877 (11th Cir. 2006). Documents relevant to the defendant's affirmative defenses, rather than the plaintiff's claim, will fail to meet the centrality requirement. *Id.*

## A.     Rule 12(b)(7)

Rule 12(b)(7) of the Federal Rules of Civil Procedure allows a court to dismiss an action for failure to join an indispensable party under Rule 19. Determining whether an

absent party is indispensable requires a two-part analysis. First, the court must determine under the standards of Rule 19(a) whether this person is a necessary party. *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). If the party is unnecessary, the court need not reach need not reach whether it is indispensable under Rule 19(b). *Testaiuti v. United States*, No. 15-80920-CIV, 2016 WL 7626212, at *3 (S.D. Fla. July 18, 2016)

But where the absent party is necessary and cannot be joined, the court must proceed to the second step and inquire "whether, applying the factors enumerated in Rule 19(b), the litigation may continue." *Id.* If the absent party is indispensable, the suit must be dismissed. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279 (11th Cir. 2003). The burden is on the movant to show that an absent party is necessary, cannot be joined and is, finally, indispensable so the action should be dismissed. *See In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1194 (11th Cir. 2015) (holding that movant "did not meet its burden of proving that [persons] not joined were both necessary and indispensable to the proceeding").

### III.    DISCUSSION

Morad moves to dismiss of SOS's Amended Complaint on several grounds. (*See* Doc. 11). The Court addresses each claim and argument.

### A.    Civil Theft (Count I)

Count I presents a claim for civil theft, which "derives from two statutory sources: the criminal section setting forth the elements of theft, and the civil section granting private parties a cause of action for a violation of the criminal section." *Palmer v. Gotta*

*Have It Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289, 1303 (S.D. Fla. 2000) (quoting *Ames v. Provident Life & Accident Ins. Co.*, 942 F. Supp. 551, 560 (S.D. Fla. 1994)). To sue for civil theft, a plaintiff must allege that the defendant (1) knowingly (2) obtained or used, or endeavored to obtain or use, plaintiff's property with (3) felonious intent (4) to either temporarily or permanently (a) deprive plaintiff of its right to or a benefit from the property or (b) appropriate the property to defendant's own use or to using any person not entitled to the property. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (citing Fla. Stat. §§ 812.014(1) (theft statute) and Fla. Stat. §§ 772.11 (civil theft statute).

Beyond alleging these elements, Florida law also states that to bring a claim for civil theft, the plaintiff "must make a written demand for . . . the treble damage amount of the person liable for damages." Fla. Stat. § 772.11(1). If the recipient complies "within 30 days after receipt of the demand, that person shall be given a written release from further civil liability for the specific act of theft . . . by the person making the written demand." *Id.* With these principles in mind, Morad first argues that SOS's claim should be dismissed because SOS served him with a written demand the same day it filed the action. (Doc. 11, pp. 10–11; Doc. 11-5 ("**Demand Letter**"). The Court disagrees.

Although SOS jumped the gun by filing the civil theft count before serving Morad with its Demand Letter, Morad had thirty-days to comply with the SOS's written requests. (*See* Doc. 10, ¶¶ 25, 26 (alleging that Morad did not comply with the Demand Letter within thirty days).) There is no indication that Morad was prejudiced by SOS's premature filing. The Court thus declines to dismiss SOS's civil theft claim on this basis.

*See Christopher Adver. Group, Inc. v. R & B Holding Co., Inc.*, 883 So.2d 867, 875-76 (Fla. 3d DCA 2004) (reversing directed verdict for defendant because plaintiff failed to comply with civil theft statute by sending demand letter to defendant on same day complaint was filed, and holding failing to follow the statute was cured by passing time).

Next, Morad argues that "[t]he [D]emand [L]etter belies [SOS]'s claim that [he] stole $273,592.16" because SOS "expressly acknowledge[s]" that it voluntarily paid "$182,831.60 of that sum . . . for [his] reimbursable housing and car insurance expenses." (Doc. 11, p. 11.) Morad therefore moves the Court to dismiss SOS's claim for civil theft. (*Id.*) In resolving his motion, Morad requests that the Court consider the Demand Letter because SOS referenced it in the Amended Complaint." (*Id.* at 10.)

The Court rejects Morad's invitation to consider the Demand Letter because it is not central SOS's claim for civil theft. Crucial to this determination is the distinction between a document central to a plaintiff's claim and a document central to a defendant's affirmative defense. As the Eleventh Circuit explained in *Financial Security Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007), a document is "central" to a plaintiff's claim if the plaintiff offers the document into evidence to prove its claim. That is not the case here.

The Demand Letter may relate to the Morad's defenses (or a question of damages), but SOS need not offer the letter into evidence to prevail on its claim for civil theft.[1] The

_____

[1] Even if the Court were to consider the Demand Letter, it would not dismiss SOS's civil theft claim because Defendant grossly mischaracterizes its substance. Nowhere in the Demand Letter does SOS acknowledge that it paid Defendant $182,831.60 for reimbursable housing and car insurance expenses. To the contrary, the Demand Letter

-8-

Court declines to consider the Demand Letter in resolving the present Motion. *See, e.g.*, *Shovlin v. Bayview Loan Servicing, LLC*, No. 6:18-cv-308-ORL-31GJK, 2018 WL 4092123, at *3 (M.D. Fla. Aug. 28, 2018) (declining to consider extrinsic materials central to the defendant's defense, but not the plaintiff's claim).

SOS's claim for civil theft extends beyond allegations that Morad stole $182,831.60. SOS also alleges that Morad forged SOS checks and made them payable to either himself or his wife for $90,760.56. Taken as true, these facts alone state a claim against Morad for civil theft. The Motion is denied on this claim.

## B.     Conversion (Count II)

In Count II, SOS asserts a conversion claim. (Doc. 10, ¶¶ 28–32.) Conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001). To state a claim for conversion, a plaintiff must allege (1) ownership of the property at issue; and (2) that the defendant wrongfully asserted dominion over that property. *Edwards v. Landsman*, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011).

SOS presents two possible acts of conversion. It claims that Morad converted corporate funds from SOS for his own personal use by directing payments from SOS's bank account and by forging checks he made payable to himself or his wife ("**First Claim**"). (Doc. 10, ¶ 29.) SOS also claims that Morad converted the funds he received

---

states in relevant part that "[Defendant] had his personal expenses, rent and insurance, paid directly from SOS's operating account *without SOS's knowledge or authorization* for a total sum of no less than $182,831.60." (*See* Doc. 11-5, p. 2 (emphasis added).)

through the Loan because Morad agreed to repay the Loan but now refuses to do so ("**Second Claim**"). (*Id.* ¶ 30.)

1. **First Claim**

Morad contends that the First Claim fails because SOS "makes no attempt to allege a specific, identifiable fund." (Doc. 11, p. 13.) Morad is wrong. In Florida, a contractual debt is one, "which can be discharged by the payment of money, cannot generally form the basis of a claim for conversion." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (3rd DCA 2008). Thus, if there is a contractual relationship between the parties, the alleged conversion "must go beyond, and be independent from, a failure to comply with the terms of a contract." *Id.* the plaintiff must point to a specific and identifiable fund. *See Allen v. Gordon*, 429 So. 2d 369, 370 (Fla. 1st DCA 1983) (citing *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)).

"To be a proper subject of conversion, each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified." *Belford Trucking Co.*, 243 So.2d at 648. "Money is capable of identification where it is delivered at one time, by one act and in one mass, or . . . where the wrongful possession of such property is obtained." *Id.* "This identification requirement ensures that a fund of money *actually exists to pay a specific debt owed* and the [plaintiff] is not merely transforming a contract dispute into a conversion claim." *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 272 (11th Cir. 2009).[2]

---

[2] While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*,

Here, no contractual relationship existed between SOS and Morad about the Embezzled Funds. So SOS's First Claim "is not the type of claim to which the specific fund requirement was intended to apply." *See Bel–Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1109 (11th Cir. 1998) (noting that the "specific fund" requirement is an exception to the general rule that a contractual obligation to pay money cannot be enforced through an action for conversion).

Even if the requirement applied, the First Claim would still survive dismissal because SOS points to a specific and identifiable fund—i.e., the Embezzled Funds—which Morad took from SOS's main operating bank account and converted for his own personal use. The Court denies the Motion to dismiss SOS's First Claim. *See Masvidal v. Ochoa*, 505 So.2d 555 (Fla. 3d DCA 1987) (explaining that embezzling funds from an escrow account can support a conversion claim); *Allen v. Gordon*, 429 So.2d 369, 371 (Fla. 1st DCA 1983) (holding that this money was specific and identifiable when the defendant withdrew the money from a joint savings account and a certificate of deposit account.).

### 2. Second Conversion Claim

SOS's Second Claim does not fare well. Morad argues, and SOS does not dispute, that the Loan is a monetary debt dischargeable by the payment of money. (Doc. 11, p. 12.) SOS has failed to allege facts to suggest that Morad's refusal to repay the Loan is independent of his failure to comply with the Loan Agreement. To the extent SOS's conversion claim rests on Morad's alleged failure to repay the loan, the Motion is granted.

686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

**C.    Contract Claims (Counts III and IV)**

In Counts III and IV, SOS asserts claims against Morad for breach of contract and breach of good faith and fair dealing. The elements of a breach of contract claim are: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008)).

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations. A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo v. UPS Co.*, 420 F.3d 1146, 1151–52 (11th Cir. 2005) (quotations omitted).

SOS alleges that Morad entered into the Loan Agreement by orally agreeing to repay SOS for the Loan, but Morad breached the Loan Agreement by failing to pay. (*See* Doc. 10, ¶¶ 13, 34, 36–37.) SOS also alleges that Morad breached the implied covenant in the Loan Agreement by: (1) refusing to pay the Loan based on his meritless contention he is to be paid the value of the shares he does not own"; and (2) requesting the Loan "knowing . . . that he was already embezzling corporate funds without SOS's knowledge." (Doc. 10, ¶ 41.) As a result of these breaches, SOS claims it "has suffered damages in the amount of $250,000." (*Id.* ¶ 38.)

Morad does not dispute these allegations will state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing. Instead, Morad argues

that SOS's claims must be dismissed because in the Purchase Agreement, the Owners agreed to deduct the Loan from the Seed Money SOS intended to give Morad. (Doc. 11, p. 7.) Morad also contends that the Court should dismiss SOS's contract claims because the Owners "are the real parties to the Purchase Agreement" and thus "indispensable parties" that SOS failed to join to this action under Rule 19. (*Id.* at 6.) The Court is unpersuaded.

Morad's arguments rest on the faulty assumption that SOS's contract claims rest on a breach of the Purchase Agreement. (*See id.* at 5 (arguing that SOS's contract "are based on the . . . Purchase Agreement).) But as noted above, SOS's contract claims arise from the Loan Agreement, not the Purchase Agreement. In fact, according to the allegations of the Amended Complaint, which the Court accepts as true, the parties modified the Purchase Agreement in 2017, and subsequently abandoned it in January 2018. (Doc. 10, ¶¶ 14–17.) Because the Purchase Agreement is extraneous to SOS's contract claims, Morad's arguments fail.[3] So the Motion is denied on Counts III and IV.

## D.    Declaratory Relief (Counts V and VI)

In Counts V and VI, SOS seeks a judicial determination of the ongoing rights and obligations of the parties relative to the [Purchase] Agreement and Modification Agreement (collectively, "**Agreements**"). (Doc. 10, ¶ 47.) SOS also seeks a declaration from this Court on Morad's alleged ownership interest in SOS and his entitlement to

---

[3] Assuming SOS's contract claims are based on the Purchase Agreement, dismissal would be inappropriate because construction of the agreement would raise disputed issues of material fact.

unpaid past and future wages. (*Id.* ¶ 52.) Morad moves to dismiss SOS's declaratory relief claims for failure to state a claim and failure to join indispensable parties. Morad moves the Court to abstain from exercising jurisdiction over SOS's claims. (Doc. 11, pp. 5–7, 13–20.)

### 1. Indispensable Parties

First, Morad posits the Owners are "indispensable parties" that SOS failed to join to this action under Rule 19. (Doc. 11, p. 7.) But beyond simply arguing that the Owners are "the identified parties to the Purchase Agreement" (*see id.* at 13–14), Morad offers no evidence to establish that the Owners are indispensable parties.

The first step in determining whether joinder is proper under Rule 19 requires the Court to determine whether the person or entity is a necessary party. A party is necessary if: (1) in that person's absence, the court cannot accord complete relief among existing parties; or (2) the absent party claims an interest relating to the subject of the action. *Challenge Homes*, 669 F.2d at 669 (citing Fed. R. Civ. P. 19(a)(1)).

Here, the Owners have not claimed an interest. There is no indication that their absence will impede the Court's ability to accord complete relief to SOS. Apparently, the Owners entered the Purchase Agreement with Morad, not in their individual capacities, but as agents for SOS. (*See* Doc. 11-3, p. 4 (suggesting that the Owners were executing the Purchase Agreement "[o]n [b]ehalf of SOS"); *see also* Doc. 10, ¶¶ 12, 15 (alleging that SOS entered into the Purchase and Modification agreement with Morad).) Morad thus has failed to carry his burden of establishing that the Owners are necessary parties.

Even if the Owners were necessary parties, this motion for dismissal would still

fail. Dismissal under Rule 12(b)(7) is only appropriate where this party is indispensable and cannot be joined. *Focus on the Family*, 344 F.3d at 1280 (citing *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 358 (2d Cir. 2000)). Morad has not demonstrated that the Owners cannot joined as a party to this action. The Court does not find that the Owners are indispensable parties or that dismissal is warranted for Count IV and V on these grounds.

### 2.    Failure to state a claim

Next, Morad contends that SOS has failed to state its declaratory relief claims because the claims are not consistently pled and run counter to the documentary evidence attached to Morad's Motion. (Doc. 11, pp. 14–15). Morad argues that "Count V is internally inconsistent with Count VI" because Count VI alleges "that the Modification Agreement was mutually rescinded," while Count V alleges that "the Purchase Agreement was modified by the Modification Agreement." (Doc. 11, p. 14.) Morad also argues that Count V contradicts the Purchase Agreement, the Modification Agreement, and "official [SOS] meeting minutes" because "the documents clearly show that he was a shareholder [of SOS] at the time of the Purchase Agreement" and that "the SOS Partners were offering to purchase [his] interest." (*Id.*) Yet these arguments fail at the pleading stage, as they require interpretation of these Agreements. The Court finds the claims for declaratorily relief survive Morad's 12(b)(6) Motion on these grounds.

### 3.    Abstention

As his final argument, Morad argues that the Court should abstain from exercising jurisdiction over SOS's claims for declaratory relief under the *Wilton-Billhart* doctrine,

named after the Supreme Court's decisions in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) and *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942). Morad argues that the Court should abstain from entertaining SOS's claims under the *Colorado River* doctrine, derived from the Supreme Court's ruling in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The Court rejects Morad's arguments.

### a. *Wilton-Brillhart* doctrine

SOS brings its declaratory relief claims under the Declaratory Judgment Act ("**DJA**"), which grants federal courts the discretion to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Under the DJA, federal courts may rule on an actual controversy, but they are "under no compulsion to exercise . . . jurisdiction." *Brillhart*, 316 U.S. 491, 494 (1942); *Wilton*, 515 U.S. at 284. The Supreme Court has "repeatedly characterized the [DJA] as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton*, 515 U.S. at 287 (citations omitted).

Consistent with these precepts, the U.S. Court of Appeals for the Eleventh Circuit has long held that district courts may "decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties." *Ven-Fuel, Inc. v. Dep't of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982). In *Ameritas Variable Life Insurance Co. v. Roach*, the Eleventh Circuit reaffirmed *Ven-Fuel* and furnished district courts with guidance on how to wield their *Wilton-Brillhart* discretion under the DJA when, as here, there are parallel state proceedings. *See* 411 F.3d 1328, 1330 (11th Cir. 2005). The *Ameritas* court promulgated

nine non-exhaustive factors[4] for district courts to consider when determining whether to exercise jurisdiction over such a suit. *Id*. at 1330–31.

Morad contends this action and the State Court Action are parallel proceedings and that the *Ameritas* factors support abstention under the *Wilton-Brillhart* doctrine. (*See* Doc. 11, pp. 15–18.) Not so. "There is no doubt that a court may dismiss or stay an action under the *Wilton-Brillhart* abstention doctrine where solely declaratory relief is sought." *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009). But here, both actions seek declaratory and non-declaratory relief. As the Eleventh Circuit has yet to decide whether the *Wilton-Brillhart* doctrine applies to such actions, the Court looks to other circuits—where three approaches have emerged:

> [S]ome circuits hold that the *Wilton*[-*Brillhart*] standard is never applicable where non-declaratory claims are joined with declaratory ones, and that the abstention decision must be reached by reference to *Colorado River* only. . . . Other circuits consider whether the nondeclaratory claims are independent of any claim for purely declaratory relief; if so, then Wilton does not apply. . . . Still other courts follow an "essence of the lawsuit" or "heart of the action" test that looks to whether the outcome of the non-declaratory claims hinges upon the outcome of the declaratory ones; if so, then *Wilton's* standard governs; if not, then *Colorado River* applies.

*Regions Bank v. Commonwealth Land Title Ins. Co.*, No. 11-23257-CIV, 2012 WL 1135844, at *3 (S.D. Fla. Apr. 4, 2012); *see also R.R. Street & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 715 (7th Cir.2009) (collecting cases).

Applying these three approaches and assuming without deciding this action is

---

[4] *See Lexington Ins. Co. v. Rolison*, 434 F. Supp. 2d 1228, 1238–44 (S.D. Ala. 2006) (discussing the *Ameritas* factors).

parallel to the State Court Action, the Court concludes that the *Wilton-Brillhart* doctrine does not apply. SOS asserts four claims independent of its claims for declaratory relief: (1) civil theft, (2) conversion, (3) breach of contract, and (4) breach of implied covenant of good faith and fair dealing. (*See* Doc. 10, ¶¶ 20–42.) No claims hinge on the outcome of SOS's claims for declaratory relief. These claims are independent of the claims asserted for declaratory relief. The Court thus declines to abstain under the *Wilton-Brillhart* doctrine.[5]

### b.    *Colorado River* doctrine

Under the *Colorado River* doctrine, a district court may dismiss or stay an action where there is an ongoing parallel action in state court only in "exceptional circumstances." *See Moorer v. Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 997 (11th Cir. 2004). This doctrine provides for an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813. "[o]nly the clearest of justifications will warrant dismissal." *Id.* at 819. In determining whether such "exceptional circumstances" exist, courts consider these factors:

> (1) the order in which the courts assumed jurisdiction over property; (2) the relative inconvenience of the fora; (3) the order in which jurisdiction was obtained and the relative

---

[5] *See, e.g., Hall v. Sargeant*, No. 9:18-CV-80748, 2018 WL 6027028, at *6 (S.D. Fla. Oct. 2, 2018), report and recommendation adopted, No. 18-CV-80748, 2018 WL 6019221 (S.D. Fla. Nov. 16, 2018) (concluding that the *Wilton-Brillhart* doctrine did not apply where the plaintiff did not seek pure declaratory relief under the Declaratory Judgment Act, but also requested coercive relief; *see also Mega Life and Health Ins. Co. v. Tordion*, 399 F. Supp. 2d 1366, 1369-70 (S.D. Fla. 2005) (collecting cases and holding that *Colorado River*, not *Wilton-Brillhart* doctrine, applies to mixed claims).

> progress of the two actions; (4) the desire to avoid piecemeal litigation; (5) whether federal law provides the rule of decision; and (6) whether the state court will adequately protect the rights of all parties.

*Moorer*, 374 F.3d at 997 (citation omitted).

To avoid forum-shopping, courts also consider "the vexatious or reactive nature of either the federal or the state litigation." *Moses H. Cone Mem'l Hosp v. Mercury Constr. Corp.*, 460 U.S. 1, 17 n.20 (1983). "No single factor is dispositive and [the Court is] required to weigh the factors with a heavy bias favoring the federal courts' obligation to exercise the jurisdiction that Congress has given them." *Jackson-Platts v. Gen. Elec. Capital Corp.*, 727 F.3d 1127, 1141 (11th Cir. 2013). Each is applied in a "pragmatic, flexible manner with a view to the realities at hand." *Moses*, 460 U.S. at 103.

### i.      Jurisdiction over property

"The first factor looks not to the location of the res, but the jurisdiction of the court." *Ambrosia Coal & Const. Co v. Pages Morales*, 368 F.3d 1320, 1332 (11th Cir. 2004). "[T]his factor applies only where there is a proceeding in rem." *Jackson–Platts*, 727 F.3d at 1141. Here, neither case involves the disposition of property, therefore, this factor does not favor abstention. *Id.* ("[W]here 'there is no *real* property at issue,' this factor does not favor abstention." (quoting *Maharaj v. Sec'y Dep't Corr.*, 432 F.3d 1292, 1306 (11th Cir. 2005))).

### ii.      Inconvenience of the federal forum

The second factor concerns the inconvenience of the federal forum and "focuses 'primarily on the physical proximity of the federal forum to the evidence and witnesses.'"

*Id.* (quoting *Ambrosia Coal*, 368 F.3d at 1332). When the federal and state courts are in the same geographical area, courts routinely consider this factor to be neutral. *See, e.g., O'Dell v. Doychak*, No. 6:06-cv-677-Orl-19KRS, 2006 WL 4509634, at *7 (M.D. Fla. Oct. 20, 2006); *Bosdorf v. Beach*, 79 F. Supp. 2d 1337, 1344 (S.D. Fla. 1999). Both the state court and this Court are in Orlando, Florida. "the federal forum and the state forum are equally convenient" and "this factor thus cuts against abstention." *See Jackson-Platts*, 727 F.3d at 1141.

### iii.     Order in which the fora assumed jurisdiction

The third factor focuses on "not only the chronological order in which the parties initiated the concurrent proceedings but [on] the progress of the proceedings." *TranSouth Fin. Corp. v. Bell*, 149 F.3d 1292, 1295 (11th Cir. 1998); *Moses*, 460 U.S. at 21. Here, this action was filed before the State Court Action, (*see* Doc. 11, p. 20; Doc. 15, pp. 20–21), and there is no material difference in the progress of either case, as both actions are in their infancy. So this factor does not favor abstention.

### iv.     Piecemeal litigation

The fourth factor monitors the potential for piecemeal litigation. Run of the mill piecemeal litigation will not suffice: this factor "does not favor abstention unless the circumstances enveloping those cases will likely lead to piecemeal litigation that is abnormally excessive or deleterious." *Ambrosia*, 368 F.3d at 1333. "In *Colorado River*, for example, the federal government sued 'some 1,000 water users,' seeking a declaration of the Government's rights to waters in certain rivers and their tributaries." *Id.* (quoting *Colorado* River, 424 U.S. at 805).

Other than arguing that the cases include "substantially the same parties and substantially the same issues" Morad offers nothing to show that a refusal to abstain will lead to "abnormally excessive or deleterious" litigation. This factor does not favor abstention. *See Jackson–Platts*, 727 F.3d at 1142–43; *Ambrosia*, 368 F.3d at 1333.

### v. Application of state or federal law

The fifth factor requires the Court to determine whether state or federal law will apply. *Jackson-Platts*, 727 F.3d at 1143. The law favors abstention "only where the applicable state law is particularly complex or best left for state courts to resolve." *Id.* Here, the pending claims involve state law issues related to breach of contract, civil theft, conversion, and declaratory relief. Nothing about those claims bespeaks the requisite complexity. Federal courts are often called upon to resolve state law claims. So this factor weighs against abstention.

### vi. Adequacy of the state court to protect the parties' rights

The sixth factor "will only weigh in favor or against abstention when one of the fora is inadequate to protect a party's rights." *Ambrosia*, 368 F.3d at 1334. The Court finds that both fora are adequate to protect the rights of the parties and this factor is neutral and does not support abstention. *See Noonan S., Inc. v. Volusia Cty.*, 841 F.2d 380, 383 (11th Cir. 1988) ("The fact that both forums are adequate to protect the parties' rights merely renders this factor neutral."); *accord Ambrosia*, 368 F.3d at 1334.

### vii. Vexatious or reactive litigation

Last, the Court evaluates the vexatious or reactive nature of these dueling lawsuits.

*See Ambrosia*, 368 F.3d at 1331. For this consideration, courts have looked to the chronology of cases, the plaintiff's initial filing options (and choice), and whether the suit is identical and follows an adverse ruling in state court. *See, e.g.*, *Redner v. City of Tampa*, 723 F. Supp. 1448, 1454 (M.D. Fla. 1989); *see also Bosdorf*, 79 F. Supp. 2d at 1346; *Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 363 (2d Cir. 1985).

Morad contends this factor "weighs heavily in favor of abstention" because SOS did not begin the action until his attorney threatened to sue for the Seed Money in the Purchase Agreement. The Court disagrees. SOS's suit may have been "reactive" in the sense that SOS did not sue Morad until he "threatened to sue," but the Court is unpersuaded that SOS's initiation was vexatious or reactive for abstention under *Colorado River*. There is no indication that this suit was filed in response to the State Court Action or that it follows an adverse ruling in state court. SOS sued first, after learning that Morad had embezzled Corporate Funds. The Court finds this factor does not weigh for or against abstention.

Having explored all factors of the *Colorado River* analysis, the Court concludes that Morad has not established enough exceptional circumstances to warrant abstention. The Court will thus deny Morad's request to abstain.

## IV.  CONCLUSION

It is **ORDERED AND ADJUDGED**:

1.     Morad Salem's Motion to Dismiss, or Alternatively, to Abstain (Doc. 11) is

       **GRANTED IN PART** and **DENIED IN PART**:

       a.     To the extent that SOS's claim for conversion rests on Defendant's

failure to repay the Loan, the Motion is **GRANTED**.

    b.      In all other respects, the Motion is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 22, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record